JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 601-6766 (Office)
(310) 295-2385 (Fax)

*Attorneys for Plaintiffs and the Putative Class*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**STEPHEN PLOTSKER** and **MICHAEL KLEEMANN,** individually and on behalf of all others similarly situated,

Plaintiffs,

v.

**ENVATO PTY LTD.**; **ENVATO ELEMENTS PTY LTD.**,

Defendants.

**Case No. 2:24-cv-4412**

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Stephen Plotsker and Michael Kleemann ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge, or, where applicable, information, belief, and the investigation of counsel:

## NATURE OF THE ACTION

1. This case is about Defendants Envato Pty Ltd. ("Envato Ltd.") and Envato Elements Pty Ltd.'s ("Envato Elements," and collectively with Envato Ltd., "Envato" or "Defendant") unlawful disclosure of Plaintiffs' and Class Members' private information about their personal video-viewing habits and activities.

2. Envato Ltd. develops, owns, and operates the subscription service, Envato Elements, which features over one hundred thousand prerecorded videos.[1] Envato markets its library of prerecorded videos to content creators. As Envato states on its website "our subscriptions put great design in reach for everyone" and "with unlimited downloads, you're free to push your creative boundaries and try new things."[2]

3. Envato makes money by offering paid subscriptions to this video library. As of September 2022, Envato had more than 665K paid subscribers.[3]

4. Plaintiffs Plotsker and Kleemann and other Class Members must subscribe to Envato to license and download prerecorded videos at www.elements.envato.com. A basic subscription costs $16.50 per month.[4]

//

//

//

//

//

//

---

[1] *See* https://www.elements.envato.com/stock-video/stock-footage (last visited April 9, 2024).
[2] *See* https://www.elements.envato.com/about (last visited April 9, 2024).
[3] *See* https://www.envato.com/blog/five-milestones-that-define-envato-2022/ (last visited April 9, 2024).
[4] *See* https://elements.envato.com/pricing (Last visited April 9, 2024).

//

//

Figure #1




5. Federal law recognizes, through the Video Privacy Protection Act ("VPPA"), that our video-viewing habits are intimately private. The law accordingly requires companies that sell, rent, or offer subscriptions to prerecorded videos to maintain their customers' privacy and forbids, among other things, the knowing disclosure of customers' video choices to any third party without the customers' specific advance written consent.

6. Despite its clear legal obligations under the VPPA, Defendant knowingly discloses its subscribers' personally identifiable information—including a record of every video clip they view or download—to a third party, Meta Platforms Inc. ("Meta") (formerly known as Facebook) ("Meta" or "Facebook"), without Plaintiffs' or other Class Members' consent.

7. Plaintiffs bring this class action on behalf of themselves and all others similarly situated to recover actual and statutory damages against Envato for its unlawful conduct.

**PARTIES**

8. Plaintiff Stephen Plotsker is, and has been at all relevant times, a resident of Boca Raton, Florida. In or about January 2019, Plotsker signed up for a service that Envato describes as an

"unlimited creative subscription,"[5] by agreeing to pay a monthly subscription rate in exchange for access to Envato's library of prerecorded videos. Since he first subscribed to Envato's services, Plotsker has viewed and downloaded, and continues to view and download, pre-recorded videos on Envato's website—www.elements.envato.com. Throughout the time that Poltsker has subscribed to Defendant's services, he also has owned a Facebook account and has used this account during that same period.

9. Plaintiff Michel Kleemann is, and has been at all relevant times, a resident of San Diego, CA. In or about August 2019, Kleemann signed up for a service that Envato describes as an "unlimited creative subscription,"[6] by agreeing to pay a monthly subscription rate in exchange for access to Envato's library of prerecorded videos. Since he first subscribed to Envato's services, Kleeman has viewed and downloaded, and continues to view and download, pre-recorded videos on Envato's website—www.elements.envato.com. Throughout the time that Kleemann has subscribed to Defendant's services, he also has owned a Facebook account and has used this account during that same period

10. Defendant Envato Pty Ltd. and Defendant Envato Elements Pty Ltd. are both Australian Proprietary Limited Companies. On information and belief, Envato has its sole United States office in Los Angeles, California.[7]

**JURISDICTION**

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because this suit is brought under the laws of the United States, *i.e.*, the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq*.

12. This Court has personal jurisdiction over Envato because Envato has an office in Los Angeles, California,[8] which, on information and belief, employs at least 8 Envato employees, including

---

[5] *See* https://elements.envato.com/?gad_source=1&gclid=CjwKCAjwh4-wBhB3EiwAeJsppAu6pecY952mnl0qcfNuGEEFQgW09z2jC4S_sTWrBE0oMOopnJe-tRoCe5kQAvD_BwE.

[6] *See* https://elements.envato.com/?gad_source=1&gclid=CjwKCAjwh4-wBhB3EiwAeJsppAu6pecY952mnl0qcfNuGEEFQgW09z2jC4S_sTWrBE0oMOopnJe-tRoCe5kQAvD_BwE.

[7] *See* https://help.author.envato.com/hc/en-us/articles/360000470866-All-About-Envato-Our-Products-and-Platforms; *see also* www.linkedin.com/company/envato/about/.

[8] *See* https://www.linkedin.com/company/envato/.

high-level officers such as Envato's Vice President of Engineering[9] and Envato's United States Sales and Account Management professionals.[10]

13. This Court has specific jurisdiction over Defendant because Defendant has purposefully and differentially directed and targeted the U.S. market, by and through the following actions described in subparagraphs (a)-(e):

(a) Envato's server facilities are located solely in San Francisco, which on information and belief, provides Envato's U.S. customers with reduced latency and improved website performance as compared to Envato's non-U.S. based customers.[11]

(b) Data from May 2024, shows that the majority of Envato's market comes from the United States; specifically, 12.5%, followed by Brazil with 9.185% of traffic.[12]

(c) SendGrid, now known as Twillo-SendGrid, located in Irvine California, creates and hosts emails for Envato, which may include, but not limited to, transactional emails with Envato, automated emails, new account details, account confirmations, and forgotten passwords.

(d) Recurly, Inc., a United States corporation located in San Francisco, California, manages Envato's subscription service and manages the subscription payment process.

(e) Envato regularly markets and sells its product via its interactive website to subscribers in the California and other states, who watch and/or download Envato's prerecorded videos.

(f) On information and belief, Envato also pays California and U.S. based developers (called "Envato Authors") to create digital content. Envato issues an IRS Form 1099 to those U.S.-based Authors.[13]

(g) Envato also charges, collects and remits sales tax to the relevant local revenue authorities within the United States for each sale that occurs through its marketplace, and

---

[9] *See, e.g.*, www.linkedin.com/in/michaelrobinette.
[10] *See e.g.*, www.linkedin.com/in/nick-zeuli-09796092/.
[11] Envato's servers are actively managed by Cloudflare, Inc., a U.S. based service.
[12] See May 2024 Similiarweb www.elements.envato.com's website analysis.
[13] *See* https://help.author.envato.com/hc/en-us/articles/900001533223-How-to-View-your-Tax-Summary.

reports that sales tax to the relevant authority accordingly. [14]

(h) Envato's unlawful disclosure of Plaintiff Kleemann's "personally identifiable information", in violation of 18 U.S.C. § 2710 (b), occurred in California, causing the inflection of actionable harm and injury to Plaintiff Kleemann in California, where Plaintiff resides.

(i) Plaintiff Kleemann accessed Defendant's website, www.elements.envato.com, from California.

14. Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b), because Defendant's sole U.S. office is in this District.

**The VPPA**

15. The origins of the VPPA began with President Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a video rental store disclosed the nominee's rental history. Congress responded by passing the VPPA, with an eye on the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think this is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

16. The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

17. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any

[14] *See* https://help.market.envato.com/hc/en-us/articles/360001107286-US-Sales-Tax-Information-for-Buyers.

person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## FACTUAL BACKGROUND

### I. Envato Has Provided Video Tape Services Throughout the Class Period

18. Envato operates a stock video subscription service by which its users can watch, license and download pre-recorded videos.[15]

19. Plaintiffs and other Class Members must subscribe to Envato in order to license and download prerecorded videos on www.elements.envato.com. A basic subscription costs $16.50 per month.

20. Once subscribed to Envato, Plaintiffs and other Class Members may select from among hundreds of thousands of pre-recorded videos.

21. Thus, Defendant is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4) because it is engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."

22. And, Plaintiffs and other Class Members are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1) because they are "subscriber[s] of goods or services from a video tape service provider."

### II. Envato Unlawfully Disclosed and/or Released Plaintiffs' and Class Members' Personally Identifiable Information to Meta

23. Throughout the Class Period, beginning on an unknown date and continuing to the present, Defendant has released or disclosed Plaintiffs' and other Class Members' Personally Identifiable Information to Meta using Meta's tracking pixels.

24. Personally Identifiable Information ("PII") is defined as "information which identifies

[15] *See* https://www.elements.envato.com/stock-video/stock-footage (last visited April 9, 2024).

a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

25. As the Federal Trade Commission has stated, companies who use pixels, like the ones used by Defendant in this case, have numerous options to monetize their use of these pixels. According to the FTC:

> Pixel tracking can be monetized in several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns. The data can be used to target more specific audiences with ads and other marketing messages. Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[16]

### *A. The Meta Tracking Pixel*

26. Meta, which operates Facebook and was called Facebook, Inc. until changing its name in January 2022, is the world's largest social media company. Meta reported having 2.04 billion daily active users as of March 2023,[17] and reported $116.61 billion in revenue in fiscal year 2022.[18]

27. Meta's current revenue, as well as its revenue when the company was called Facebook, Inc., has been derived almost entirely from selling targeted advertising to Facebook users, users of its family of apps including Instagram, and internet users on non-Facebook sites that integrate Meta marketing source code on their websites. Meta reported in Fiscal Year 2022 that its revenue from advertising was over $113 billion and Meta stated that it "generated substantially all of our revenue

---

[16] *See* https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (citing M. Eddy. "How Companies Turn Your Data Into Money." PC Mag. October 10, 2018. https://www.pcmag.com/news/how-companies-turn-your-data-into-money) (last visited June 13, 2023.)

[17] Meta Reports First Quarter 2023 Results, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-First-Quarter-2023-Results-2023.pdf

[18] Meta Reports Fourth Quarter and Full Year 2022 Results, 2/1/23, https://s21.q4cdn.com/399680738/files/doc_financials/2022/q4/Meta-12.31.2022-Exhibit-99.1-FINAL.pdf (last visited 6/6/2023).

from selling advertising placements on our family of apps to marketers."[19] In its 10k filing covering the fiscal year 2018, Facebook similarly admitted that, "We generate substantially all of our revenue from selling advertising placements to marketers."[20]

28. Facebook describes itself as a "real identity platform,"[21] meaning users are allowed only one account and must share "the name they go by in everyday life."[22] Therefore, when users create an account, they must provide their first and last name, along with their birthday and gender.[23]

29. Facebook sells advertising space by highlighting its ability to target users.[24] Facebook can target users so effectively because it surveils user activity both on and off its site.[25] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "Connections".[26] Facebook complies this information into a generalized dataset called "Core Audiences", which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[27]

30. Advertisers can also build "Custom Audiences."[28] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers

---

[19] Meta, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2022, https://www.sec.gov/Archives/edgar/data/1326801/000132680123000013/meta-20221231.htm (last visited June 19, 2022).

[20] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018. https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm.

[21] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[22] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[23] FACEBOOK, SIGN-UP, http://www.facebook.com/

[24] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[25] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[26] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[27] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[28] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

or people who have visited [their] website."[29] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[30] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[31] One such Business Tool is the Meta Tracking Pixel.

31. The Meta Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[32] When the Meta Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

32. Advertisers control what actions—or, as Facebook calls it, "events"—the Meta Tracking Pixel will collect along with what pages a visitor views and what buttons a visitor clicks.[33] Advertisers can also configure the Meta Tracking Pixel to track other events. Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[34] An advertiser can also create their own tracking parameters by building a "custom event."[35]

---

[29] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[30] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[31] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494.

[32] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[33] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

[34] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[35] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

33. Advertisers control how the Meta Tracking Pixel identifies visitors. The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[36] Http Headers collect "IP Addresses, information about web browser, page location, document, [referrer] and persons using the website."[37] Pixel-specific Data includes "the Pixel ID and cookie."[38]

34. FTC Commissioner Rohit Chopra addressed the harms that can be caused by sharing information with Facebook when he stated in 2019, "Because behavioral advertising allows advertisers to use mass surveillance as a means to their undisclosed and potentially nefarious ends, Facebook users are exposed to propaganda, manipulation, discrimination, and other harms. . . . Facebook's massive, private, and generally unsupervised network of advertisers has virtually free rein to microtarget its ads based on every aspect of a user's profile and activity. The company's detailed dossiers of private information includes things like a user's location and personal connections, but it also includes the history of everything a user has ever done wherever Facebook is embedded in the digital world."[39]

### *B. Envato Knowingly Sends Plaintiffs' and other Class Members' Personally Identifiable Information to Meta*

35. Starting on a date unknown and continuing to the present, Defendant embedded the Meta Pixel on and throughout its website—www.elements.envato.com—and transmitted Plaintiffs' and Class Members' PII, including their personal identifiers, without their consent, to Meta in accordance with the Meta Pixel's configuration.

36. When Plaintiffs or another Class Members visited www.elements.envato.com, the Meta Pixel automatically caused the Plaintiffs' or the Class Members' personal identifiers, including IP addresses and the c_user, _fr, _and datr cookies, to be transmitted to Meta, attached to the fact that the Plaintiffs or the Class Member had visited the website and the titles of the webpages the Plaintiffs or the Class Member visited.

---

[36] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

[37] *See id.*

[38] *See id.*

[39] *See* Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No, 1823109, July 24, 2019. https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement on facebook_7-24-19.pdf.

37. The cookies that were transmitted as a result of the Meta Pixels that Defendant installed on its website conveyed Plaintiffs' and Class Members' Facebook IDs (through the c_user cookie), which can be used by Facebook and any ordinary person to find the user's real name, the specific and unique web browser from which the customer is sending the communication, and an encrypted combination of the information contained in those two cookies (fr cookie).

38. Envato's hosted Meta Tracking Pixel transmits information associated with two distinct events to Facebook:[40]

Figure #2




39. The information associated with these two events—PageView and Button Click— and transmitted to Facebook permits an ordinary person to identify a specific individual's video viewing behavior.

40. When a subscriber visits a page that hosts a prerecorded video, the PageView Event transmits the Uniform Resource Locator ("URL") accessed, which contains the title of the video:

//

//

//

//

//

//

//

//

//

[40] This data derives from a tool created and offered by Facebook.

//

//

//

Figure #3




41. The Button Click registers every time a visitor clicks the download button to download a prerecorded video:

//

//

//

//

//

//

//

//

//

//

//

Figure #4




42. The button click event also sends the title of the prerecorded video in plain text, identifiable by an ordinary person, to Meta.

43. A visitor who has not logged out of Facebook while watching and/or downloading a video on Envato will transmit the c_user cookie to Facebook. The c-user cookie contains that visitor's unencrypted Facebook ID. When accessing the above video, for example, the Meta Pixel on Envato's website compels the visitor's browser to send multiple cookies, which are visible in Figure #5 below:

//

//

//

//

Figure #5

| Name ▲ | Value | Do... | Path | Exp... | Size | Htt... | Sec... | Sa... | Part... | Prio... |
|---|---|---|---|---|---|---|---|---|---|---|
| c_user | 10000[redacted] | .fac... | / | 202... | 21 | | ✓ | None | | Me... |
| datr | saFWZXu696kRJfnBDt3cUDkn | [illegible] | [illegible] | 202... | 28 | ✓ | ✓ | None | | Me... |
| dpr | 1 | .fac... | / | 202... | 4 | | ✓ | None | | Me... |
| fr | 1HuD0fisoO6hWKooA.AWVZAM... | .fac... | / | 202... | 82 | ✓ | ✓ | None | | Me... |
| m_page_voice | 100003111327352 | .fac... | / | 202... | 27 | ✓ | ✓ | None | | Me... |
| ps_n | 0 | .fac... | / | 202... | 5 | ✓ | ✓ | None | | Me... |
| sb | saFWZTYcT89vhNpJu_mc48fL | .fac... | / | 202... | 26 | ✓ | ✓ | None | | Me... |
| usida | eyJ2ZXliOjEsImlkIjoiQXNiaDcyM... | .fac... | / | Ses... | 77 | | ✓ | None | | Me... |
| xs | 31%3AhG6gM_DJDN9i4w%3A2... | .fac... | / | 202... | 100 | ✓ | ✓ | None | | Me... |

44. A Facebook ID, along with the title of the prerecorded video watched and downloaded, is PII. Anyone can identify a Facebook profile-and all personal information publicly listed on that profile, including a person's first and last name—by appending the Facebook ID to the end of Facebook.com. For example, Meta CEO Mark Zuckerberg's Facebook ID is four and the URL "www.facebook.com/4" will take you to Mark Zuckerberg's Facebook page.

45. By compelling a visitor's browser to disclose the c_user cookie alongside event data for videos, Envato knowingly discloses information sufficient for an ordinary person to identify a specific individual's video viewing and downloading behavior.

46. When a visitor's browser has recently logged out of Facebook, Envato compels the browser to send a smaller set of cookies.

Figure #6

| Name ▲ | Value | Domain | Path | Expires... | Size | HttpOnly | Secure | SameSi... | Partitio... | Priority |
|---|---|---|---|---|---|---|---|---|---|---|
| fr | 0EkwwlPMvgKkJ2lEr..BmDbL6..AAA.0.0.BmECAK... | [illegible] | [illegible] | 2024-... | 55 | ✓ | ✓ | None | | Medium |
| ps_n | 0 | .facebo... | / | 2025-... | 5 | ✓ | ✓ | None | | Medium |
| sb | CiAQZrG7NqEtj_WKYG5I2p59 | .facebo... | / | 2025-... | 26 | ✓ | ✓ | None | | Medium |

47. The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[41] The datr cookies also identifies a browser.[42] Facebook, at a minimum, uses the fr cookies to identify users.[43]

48. Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated

[41] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[42] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[43] *Id.*

and encrypted value that identifies the browser. Facebook uses the cookie for targeted advertising.

49. The fr cookie will expire after 90 days unless the visitor's browser logs back into Facebook.[44] If that happens, the time resets, and another 90 days begins to accrue.[45]

50. Facebook, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

**III. Experience of Plaintiffs Stephen Plotsker and Michael Kleemann**

51. In or about 2000, Plaintiff Plotsker created a Facebook account.

52. In or about January 2019, Plaintiff Poltsker purchased a digital subscription to Envato Elements in order to watch and download videos.

53. Plaintiff Plotsker frequently visits Envato to, among other things, watch and download prerecorded videos.

54. When Plaintiff Plotsker watches and downloads videos on elements.envato.com, on information and belief, Defendant discloses to Facebook his Facebook ID, browser identifiers, and other identifying information.

55. When Plaintiff Plotsker watches and downloads videos on Envato, on information and belief, Defendant discloses his event data, which includes the pages he views and the buttons he clicked. This event data, which Envato transmits through first-party cookies, contains the titles of prerecorded videos that Mr. Plotsker watches or downloads.

56. Plaintiffs Plotsker discovered that Envato surreptitiously collected and transmitted his personally identifiable information in or about March 2024.

57. In or about 2010, Plaintiff Kleemann created a Facebook account.

58. In or about August 2019, Plaintiff Kleemann purchased a digital subscription to Envato Elements in order to watch and download videos.

59. Plaintiff Kleemann frequently visits Envato to, among other things, watch and download prerecorded videos.

---

[44] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[45] Confirmable through developer tools.

60. When Plaintiff Kleemann watches and downloads videos on elements.envato.com, on information and belief, Defendant discloses to Facebook his Facebook ID, browser identifiers, and other identifying information.

61. When Plaintiff Kleemann watches and downloads videos on Envato, on information and belief, Defendant discloses his event data, which includes the pages he views and the buttons he clicked. This event data, which Envato transmits through first-party cookies, contains the titles of prerecorded videos that Mr. Kleemann watches or downloads.

62. Plaintiff Kleemann discovered that Envato surreptitiously collected and transmitted his personally identifiable information in or about June 2024.

## TOLLING OF THE STATUTES OF LIMITATIONS

63. Each unauthorized transmission of Plaintiffs' and Class Members' Personally Identifiable Information by Defendant is a separate unlawful act that triggers anew the relevant statute of limitations.

64. Additionally, any applicable statutes of limitation have been tolled by: (1) the fraudulent concealment doctrine based on Defendant's knowing and active concealment and denial of the facts alleged herein including but not limited to its incorporation of the tracking pixels and devices; and (2) the delayed discovery doctrine, as Plaintiffs and Class Members did not and could not reasonably have discovered Defendant's conduct alleged herein until shortly before the filing of this Complaint. Plaintiffs and Class Members did not discover and could not reasonably have discovered that Defendant was disclosing and releasing their Personally Identifiable Information in the ways set forth in this Complaint until shortly before this lawsuit was filed in consultation with counsel.

65. The Meta Pixel, and other tracking tools on Envato's website, were and remain entirely invisible to a website visitor.

66. Through no fault of their own or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's unlawful conduct. Defendant's Privacy Policy does not inform Defendant's customers that their Personally Identifiable Information ("PII") will be disclosed to unauthorized third parties such as Meta as described in this Complaint.

67. Plaintiffs were therefore ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

68. Defendant has exclusive knowledge that Envato's website incorporates the Meta Pixel, and other tracking tools, and the information those pixels and tools are configured to collect and disclose, and yet Defendant failed and continues to fail to disclose to website visitors, including Plaintiffs and Class Members, that by interacting with Envato's website their PII would be disclosed to, released to, or intercepted by Meta and other unauthorized third parties.

69. Under the VPPA, Defendant was and continues to be under a duty to disclose the nature, significance, and consequences of its collection and treatment of website visitors' and customers' PII. However, to date, Defendant has not conceded, acknowledged, or otherwise indicated to Envato's customers and other website visitors that Envato has discloses or releases their PII to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

70. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

**CLASS ACTION ALLEGATIONS**

71. Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rules of Civil Procedure, Rule 23 ("Rule 23").

72. Pursuant to Rule 23, Plaintiffs seek to represent the following Class (members of which are collectively referred to herein as "Class Members"):

73. All persons in the United States who subscribed to Envato and, while having a Facebook account, viewed or downloaded prerecorded video content on www.elements.envato.com during the time the Meta Pixel was active on www.elements.envato.com.

74. Excluded from the Class are Defendant, its employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiffs' counsel.

75. Plaintiffs reserve the right to revise or amend the above Class definition based on the discovery of new information.

76. This action has been brought and may be properly maintained as a class action under Rule

23 because there is a well-defined community of interest in the litigation, the proposed Class is easily ascertainable, and Plaintiffs are a proper representative of the Class.

77. **__Numerosity__ (Rule 23(a)(1)):** The potential members of the proposed Class, as defined and identified herein, are, on information and belief, more than one hundred thousand, and so numerous that joinder of all members of the Class is impracticable.

78. **__Typicality__ (Rule 23(a)(3)):** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs have been subscribers to Envato since 2019, and have used Envato's website to view and/or download pre-recorded videos and, as a result, their PII was disclosed to Meta.

79. **__Commonality__ (Rule 23(a)(2)):** Common questions of fact and law exist as to all Class Members and predominate over the questions affecting only individual members of the Class. With respect to the Class Members these common questions include but are not limited to:

(a) Whether Defendant is engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials" and, thus, is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4);

(b) Whether Class Members are "subscriber[s] of goods or services from a video tape service provider" and, thus, are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1);

(c) Whether Defendant had Meta Pixels embedded on its website that disclosed Class Members' PII to Meta and/or any other unauthorized third party;

(d) Whether Class Members' information collected, disclosed, and shared by Defendant with unauthorized third parties, including Meta, constitutes PII within the meaning of the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*;

(e) Whether Defendant obtained "informed, written consent" from Class Members within the meaning of 18 U.S.C. § 2710(b)(2)(b) and meets the requirements of that subsection; and

(f) Whether Envato's acts and practices violated the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq*.

80. **__Adequacy of Representation__ (Rule 23(a)(4))**: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests do not conflict with those of Class Members, they have no conflict of interest with other Class Members, are not subject to any unique defenses, and have

retained competent and experienced counsel that has experience in complex consumer protection class action and cases, as well as sufficient financial and legal resources to prosecute this case on behalf of the Class. Plaintiffs and their counsel have no interest that is in conflict with or otherwise antagonistic to the interests of other Class Members. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class. Plaintiffs and counsel anticipate no difficulty in managing the litigation of this as a class action.

81. **Predominance and Superiority (Rule 23(b)(3)):** In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual members of the Class, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. Here, common issues predominate because liability can be determined on a class-wide basis even if some individualized damages determination may be required. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by complex legal and factual issues of the case to all parties and the court system. Furthermore, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs done to them and individual Class Members do not have a significant interest in controlling the prosecution of separate actions. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. If this action is not certified as a class action, it will be impossible as a practical matter for many or most Class Members to bring individual actions to recover money from Defendant, due to the relatively small amounts of such individual recoveries relative to the costs and burdens of litigation. Plaintiffs anticipate no difficulty in the management of this action which would preclude its maintenance as a class action.

82. Plaintiffs reserve the right to add representatives for the Class, provided Defendant is afforded an opportunity to conduct discovery as to those representatives.

## CAUSE OF ACTION

***Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq.***
***[On Behalf of Plaintiffs and the Class Members]***

83. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

84. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent . . . of the consumer" and the opportunity to opt out of disclosures. *See generally* 18 U.S.C. § 2710.

85. Envato is a "video tape service provider" because it is "engaged in the business, in or affecting interstate commerce, of . . . delivery of prerecorded . . . audiovisual materials." 18 U.S.C. § 2710(a)(4).

86. Plaintiffs and Class Members are "consumers" because they are "subscribers" to Envato's services, each having agreed to pay a monthly amount to access Envato's library of pre-recorded videos, a service Envato describes as a "subscription." 18 U.S.C. § 2710(a)(1).

87. Envato discloses "personally identifiable information" of Plaintiffs and other Class Members to Meta, and, on information and belief, other unauthorized third parties, because Envato sends "information which identifies a person as having requested or obtained specific video materials" from Envato, 18 U.S.C. § 2710(a)(3), specifically the title and/or identity of every video watched and/or downloaded alongside information that would permit an ordinary person to identify the user.

88. Envato does not seek, let alone receive, "informed, written consent" from Plaintiffs and other Class Members, 18 U.S.C. § 2710(b)(2)(B), and it consequently never provides them the opportunity to withdraw any such consent, 18 U.S.C. § 2710(b)(2)(iii).

89. Envato provides Plaintiffs' and Class Members PII to Meta, and, on information and belief, other unauthorized third parties, knowingly. In particular, Envato installed, embedded, and/or otherwise permitted the presence of the Meta Pixel, on its website and knew that this pixel and tracking tool would gather and disclose the titles and/or identities of prerecorded videos watched and/or downloaded by Plaintiffs and Class Members.

90. By knowingly disclosing Plaintiffs' and other Class Members' personal viewing habits, Envato violates Plaintiffs' and other Class Members' statutorily protected right to privacy in their video-viewing habits and activities. *See* 18 U.S.C. § 2710(c).

91. As a result of the above-described violations, Envato is liable to Plaintiffs and each Class Member for actual damages in an amount to be determined at trial or, alternatively, for "liquidated damages in an amount of $2,500." 18 U.S.C. § 2710(c)(2)(A). Under the Act, Envato is also liable for reasonable attorneys' fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Envato in the future.

92. Plaintiffs, on behalf of themselves and the Class, seeks relief as further described below.

**PRAYER FOR RELIEF**

Plaintiffs on behalf of themselves and other Class Members pray for judgment against Defendant as follows:

93. An order certifying the Class as requested herein;

94. An order appointing Plaintiffs Stephen Plotsker and Michael Kleemann as Class Representatives;

95. An order appointing the undersigned attorneys as Class Counsel;

96. An order awarding Plaintiffs and Class Members actual damages but not less than liquidated damages in an amount of $2,500 per Class Member per violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq.;

97. An injunction forbidding Defendant from disclosing information about users' video viewing choices to third parties pursuant to 18 U.S.C. § 2710(c)(2)(D);

98. An award of reasonable attorneys' fees and costs of suit, including costs of investigation;

99. An award of pre- and post-judgment interest as provided by law; and

100. An award of such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and all other members of the Class, hereby demands a jury trial on all issues so triable.

Respectfully submitted,

Dated: June 17, 2024

s/ Julian Hammond

JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 807-1666

*Attorneys for Plaintiffs and the Putative Class*