

**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN PLOTSKER and MICHAEL KLEEMANN,<br><br>Plaintiffs,<br>v.<br><br>ENVATO PTY LTD. and ENVATO ELEMENTS PTY LTD.,<br><br>Defendants. | Case No.: 2:24-cv-04412-MEMF-RAO<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS [ECF NO. 23]** |

Before the Court is Defendants Envato Pty Ltd. and Envato Elements Pty Ltd.'s Motion to Dismiss and Request for Judicial Notice, ECF No. 23. For the reasons stated herein, the Court GRANTS the Request for Judicial Notice and DENIES the Motion.

/ / /

/ / /

## BACKGROUND

### I. Factual Background[1]

Plaintiffs Stephen Plotsker and Michael Kleemann (collectively, "Plaintiffs") are, respectively, a resident of Boca Raton, Florida, and a resident of San Diego, California. FAC ¶¶ 8, 9. Defendants Envato Pty Ltd. and Envato Elements Pty Ltd. (collectively, "Defendants") are Australian proprietary limited companies with their sole United States office in Los Angeles, California. *Id*. ¶ 10.

Defendants develop, own, and operate a subscription service called Envato Elements, through which they market a library of over 100,000 pre-recorded videos to content creators. *Id*. ¶¶ 2, 20. Subscribers, including Plaintiffs, must subscribe to the service to license and download pre-recorded videos at www.elements.envato.com. *Id.* ¶¶ 4, 19. As of September 2022, Defendants had more than 665,000 paid subscribers. *Id*. ¶ 3.

Plotsker purchased a digital subscription to Envato Elements in or about January 2019. *Id*. ¶ 52. Kleemann purchased his subscription in or about August 2019. *Id*. ¶ 58. Both Plaintiffs frequently visit Defendants' website to, among other things, watch and download pre-recorded videos. *Id*. ¶¶ 53, 59. Plotsker discovered around March 2024, and Kleeman around June 2024, that Defendants collected and transmitted Plaintiffs' personally identifiable information ("PII"), which includes their Facebook IDs and browser identifiers, to third parties without their consent. *Id*. ¶¶ 54–56 (concerning Plotsker), 60–62 (concerning Kleemann). Defendants also disclosed information about the webpages they viewed, the buttons they clicked, and the titles of the videos they watched or downloaded. *Id*. ¶¶ 55, 61.

Defendants transmitted such data through the Meta Pixel installed on their website. *See generally id.* ¶¶ 26–50. Meta Pixel, named after Meta, the owner of Facebook and formerly known as Facebook, Inc., is a piece of code that advertisers, e.g., businesses like Defendants, can integrate into their websites. *Id*. ¶¶ 26, 31. Advertisers can configure a Meta Pixel so that it tracks, for

---

[1] The following factual allegations are derived from the allegations in Plaintiffs' First Amended Complaint, ECF No. 19 ("FAC"), except where otherwise indicated. The Court makes no finding on the truth of these allegations and includes them only as background.

instance, what webpages a visitor views, what buttons a visitor clicks, or what purchases a visitor makes, *id*. ¶ 32, or collects identifying information, such as IP addresses, *id*. ¶ 33. A Meta Pixel subsequently sends the collected information to Facebook for processing, analysis, and assimilation into datasets. *Id*. ¶ 31. Based on such datasets, Facebook sells advertisement space on its website so advertisers can engage in targeted advertising to Facebook users who may have shown interest in the advertisers' businesses. *Id*. ¶¶ 27, 30.

From an unknown date to the present, Defendants has embedded a Meta Pixel on and throughout their website and transmitted "Plaintiffs' and Class Members' [PII] . . . , without their consent, to Meta . . . ." *Id*. ¶ 35. The Meta Pixel on Defendants' website automatically transmitted to Meta Plaintiffs' or the Class Members' personal identifiers, including IP addresses, contained in the c_user, _fr, and datr cookies; the fact that they had visited Defendants' website; and the titles of the webpages that they visited. *Id*. ¶ 36; *see id.* ¶¶ 40, Fig. 3 (displaying that Defendants' Meta Pixel collected the URL and the title of a visited webpage); 41, Fig. 4 (displaying that Defendants' Metal Pixel collected button click information after a visitor clicked the download button for a pre-recorded video, and the title of the video). In particular, through the c_user cookie, the Meta Pixel that Defendants installed on their website transmitted Plaintiffs' and Class Members' Facebook IDs, which can be used by Facebook and any ordinary person to find, among other information, the Plaintiffs' and Class Members' real names. *Id*. ¶ 37; *see id.* ¶¶ 43 (explaining that "[a] visitor who has not logged out of Facebook while watching and/or downloading a video on Envato will transmit" *unencrypted* Facebook ID to Meta through the c_user cookie), 44 (explaining that by appending a Facebook ID to the end of Facebook's URL, "[a]nyone can identify a Facebook profile—and all personal information publicly listed on that profile, including a person's first and last name"); *see also id.* ¶¶ 46–50 (explaining that even when a visitor has logged out of Facebook, the _fr cookie, which contains *encrypted* Facebook ID and browser identifier information, is transmitted to Meta).

The Meta Pixel, as well as other tracking tools on Defendants' website, were and remain to this day invisible to a visitor. *Id.* ¶ 65. Moreover, Defendants' Privacy Policy does not inform their

customers that their PII will be disclosed to third parties like Meta. *Id*. ¶ 66. Defendants have not otherwise disclosed to their customers that their PII would be transmitted to third parties. *Id*. ¶ 68.

**II. Procedural History**

Plotsker, individually and on behalf of all others similarly situated, filed suit in this Court on May 28, 2024. ECF No. 1 ("Complaint"). On June 17, 2024, Plotsker filed the First Amended Complaint and added Kleemann as another representative plaintiff. ECF No. 19 ("FAC"). Plaintiffs allege only one cause of action: Violation of the Video Privacy Protection Act, 18 U.S.C. §§ 2710, *et seq*. *See generally id.*

On August 9, 2024, Defendants filed the instant Motion to Dismiss. ECF No. 23 ("Motion"). The Motion includes a Request for Judicial Notice of certain webpages from Defendants' website. ECF No. 23-15 ("RJN"). On September 20, 2024, Plaintiffs filed their opposition to the Motion.[2] ECF No. 28 ("Opposition"). Defendants filed their reply on October 11, 2024. ECF No. 29 ("Reply").

On January 2, 2025, the Court, on its own motion, continued the hearing on the Motion to April 17, 2025. ECF No. 34. The parties subsequently requested the Court continue the hearing to April 24, 2025. ECF No. 35. The Court granted the request. ECF No. 38.

On April 22, 2025, the Court deemed this matter appropriate for resolution without oral argument and vacated the hearing. ECF No. 39; *see* C.D. Cal. L.R. 7-15.

**REQUEST FOR JUDICIAL NOTICE**

**I. Applicable Law**

A court may judicially notice facts that "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). Once a

---

[2] On October 15, 2024, Plaintiffs filed *Michael Salazar v. National Basketball Association*, No. 23-1147 (2d Cir. 2024) as supplemental authority in support of the Opposition. ECF No. 30. On May 5, 2025, Defendants filed *Solomon v. Flipps Media, Inc.*, 136 F.4th 41 (2d Cir. 2025) as supplemental authority in support of the Motion. ECF No. 40. On June 24, 2025, Defendants filed *Hughes v. National Football League*, No. 24-2656, 2025 WL 1720295 (2d Cir. 2025) as another supplemental authority in support of the Motion. ECF No. 41.

fact is judicially noticed, the court "must instruct the jury to accept the noticed fact as conclusive." Fed. R. Evid. 201(f).

On a motion to dismiss, courts are generally prohibited from "consider[ing] any material beyond the pleadings," as doing so converts the motion into a motion for summary judgment. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002). There are two exceptions: (1) a court may consider "material which is properly submitted as part of the complaint" and (2) a court may take judicial notice of "matters of public record" but not "fact that is subject to reasonable dispute" *Id*. at 688–89 (internal quotation omitted). Documents not attached to the complaint may similarly be considered without converting a motion to dismiss into a motion for summary judgment if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *See United States v. Corinthian Colleges*, 655 F.3d 984, 998–99 (9th Cir. 2011) (citing *Lee*, 250 F.3d at 688; *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)).

Courts may take judicial notice of public-facing websites whose accuracy and authenticity are "not subject to dispute." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1023 (C.D. Cal. 2008); *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 145–46 (N.D. Cal. 2020) (taking judicial notice of "screenshots and printouts" of the parties' websites). Publicly available documents, including websites, are judicially noticeable "for the fact that they exist" and not for the truth of the matter asserted therein. *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 984 (N.D. Cal. 2010).

The judicially created "incorporation by reference" doctrine provides another avenue through which a defendant may request a court treat "certain documents as though they are of the complaint itself" for a motion to dismiss. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). "[A] defendant may seek to incorporate a document into the complaint if the plaintiff refers extensively to the document or the document forms the basis for the plaintiff's claim." *Id*. (citing *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)) (cleaned up). Although a court "may assume an incorporated document's contents are true for purposes of a motion to dismiss . . . it is

improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id*. at 1003 (cleaned up).

## II. Discussion[3]

Defendants ask this Court to judicially notice Exhibit A to M to the Declaration of Mark David McPherson, ECF No. 23-1 at 2–3. Defendants argue that Exhibits A through G and M (ECF Nos. 23-2–23-8, 23-14) are true and correct copies of printouts of portions of their publicly available website to which Plaintiffs cite or referenced in the FAC. ECF No. 23-1 at 4. As to Exhibits H through L (ECF Nos. 23-9–23-13), Defendants assert that they relate to the Terms of Use, Privacy Policy, and Cookie Policy to which Plaintiffs must have agreed when they created their accounts. *Id*. at 4–5; *see* FAC ¶ 66 (referencing Defendants' Privacy Policy). Plaintiffs do not oppose the RJN. *See generally* Opp'n (incorporating Exhibits).

The Court takes judicial notice of Exhibits A through M. As to Exhibits A through G and M, the Exhibits are recent screenshots of various webpages of Defendants' public-facing website, and Plaintiffs do not dispute their accuracy and authenticity. *See In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d at 1023. As to Exhibits H through J and L, which Defendants retrieved from archival websites, the Court finds them judicially noticeable under the "incorporation by reference" doctrine. *Compare* FAC ¶¶ 4, 52–53, 58–59 (allegations about subscribing and frequently visiting Defendants' website to watch and download videos) *with* ECF Nos. 23-9 (Exhibit H, a copy of the "Sign Up" webpage), 23-13 (Exhibit L, a copy of the "Sign In" webpage as of February 16, 2023); *compare* FAC ¶ 66 (alleging that "Defendants Privacy Policy does not inform Defendants' customers that their [PII] will be disclosed to unauthorized third parties . . . .") *with* ECF No. 23-11 (Exhibit J, Privacy Policy). As to Exhibits I (Terms of Use as of October 25, 2018) and K (Cookie Policy as of January 8, 2019), although Plaintiffs do not refer extensively to them in the FAC, the Court finds that they form the basis of Plaintiffs' claim under the incorporation by reference doctrine. *See Khoja*, 899 F.3d at 1002.

---

[3] Throughout this Order, when citing to Defendants' Exhibits, ECF Nos. 23-2–23-14, the Court cites to the page numbers generated by the CM/ECF system, not to the pagination inherent in the Exhibits.

The Court, to be clear, takes notice of these Exhibits for *the fact that they existed on their respective dates of capture*. At this time, the Court does not make any findings, for instance, as to whether Plaintiffs accepted, or whether Defendants failed to adequately inform their customers of, the terms and policies of using Defendants' website. That is a fact subject to reasonable dispute, which should be determined by a jury. *See Datel Holdings Ltd.*, 712 F. Supp. 2d at 984.

For the foregoing reasons, the Court GRANTS Defendants' RJN and takes judicial notice of Exhibits A through M. ECF Nos. 23-2–23-14.

## MOTION TO DISMISS

### I. Applicable Law

Federal Rule of Civil Procedure 12(b)(1) authorizes a party to seek dismissal of an action for lack of subject-matter jurisdiction. "Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). In the context of a 12(b)(1) motion, the plaintiff bears the burden of establishing Article III standing to assert the claims. *Id*.

Rule 12(b)(1) jurisdictional challenges can be either facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). When a motion to dismiss attacks subject-matter jurisdiction on the face of the complaint, the court assumes the factual allegations in the complaint are true and draws all reasonable inferences in the plaintiff's favor. *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009). Moreover, the standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), apply with equal force to Article III standing when it is being challenged on the face of the complaint. *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012) (applying *Iqbal*). Thus, in terms of Article III standing, the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Rule 12(b)(6) allows an attack on the pleadings for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee*, 250 F.3d at 679. But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

As a general rule, leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. *See* Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008).

## II. Discussion

Defendants move this Court to dismiss the instant action for three reasons: (1) Plaintiffs lack Article III standing to assert a claim under the Video Privacy Protection Act ("VPPA"), (2) Plaintiffs failed to state a claim upon which relief can be granted, and (3) Australia is a more convenient forum. The Court considers these arguments in order and finds that Plaintiffs sufficiently pleaded standing and a claim under the VPPA. The Court also finds that Defendants have failed to demonstrate that Australia is a more convenient forum.

### A. Plaintiffs Allege Sufficiently Their Article III Standing Under the Video Privacy Protection Act.

"[T]o establish standing, a plaintiff must show [] that he suffered an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). In the context of statutory claims, there is Article III standing if plaintiff allegedly suffered "concrete harm" as a result of "defendant's violation of" the statute. *Id*. at 425–26. "[C]oncrete injuries" include not only "physical harms and monetary harms," but also "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," such as "disclosure of private information." *Id*. at 425.

Violation of the VPPA gives rise to Article III standing. S*ee* 18 U.S.C. § 2710(b)(1) (prohibiting "[a] video tape service provider [from] knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider"); *Eichenberger v. ESPN*, 876 F.3d 979, 984 (9th Cir. 2017) ("Every VPPA violation presents the precise harm and infringes the same privacy interests Congress sought to protect by enacting the VPPA.") (cleaned up).

The parties disagree as to whether Plaintiffs' likely use of Defendants' videos affords them Article III standing to assert a claim under the VPPA. Defendants argue that the statute does not grant Plaintiffs standing because they are "content creators," and content creators watch or download videos from Defendants' website "for the express purpose of using and repurposing that content for public use." Mot. at 8–9. Plaintiffs respond that they "do not allege that they watched [Defendants'] videos solely in public or downloaded [Defendants' videos] solely for public use." Opp'n at 4–5.

Assuming the factual allegations in the FAC are true and drawing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiffs have adequately alleged Article III standing to bring a claim under the VPPA. Plaintiffs allege in unambiguous terms that this action concerns Defendants' disclosure of their "personal" video-viewing habits and activities. FAC ¶ 1. Moreover, although Plaintiffs also allege that Defendants market their videos to "content creators," *id*. ¶ 2, it is reasonable to infer that even content creators watch or download such videos with non-public purpose or use in mind[4] or that users who are not content creators subscribe for Defendants' videos for non-commercial purposes. Further, Plaintiffs' allegations allow the reasonable inference that they watched or downloaded Defendants' videos in the privacy of their homes or other non-public spaces. Absent allegations that Plaintiffs watched or downloaded Defendants' videos for solely public use or only in public spaces, *see, e.g.*, *Osheske v. Silver Cinemas Acquisition Co.*, 700 F. Supp. 3d 921 (C.D. Cal. 2023) (holding that the VPPA does not protect public acts like attending a theater), the

---

[4] Defendants' Exhibit A, of which the Court takes judicial notice, contains a quote from a reviewer saying, "Envato Elements is one of those platforms that I log onto on a daily basis *even when I don't need to design anything*." ECF No. 23-2 at 3 (emphasis added).

Court finds that Plaintiffs have alleged sufficiently their Article III standing to bring a claim under the VPPA.

Accordingly, the Court DENIES the Motion to the extent that it is based on Rule 12(b)(1).

**B. Plaintiffs Allege Sufficiently a Claim Under the Video Privacy Protection Act.**

Defendants argue that Plaintiffs have failed to allege a plausible claim under the VPPA. To do so, Plaintiff must allege that "(1) a defendant is a video tape service provider, (2) the defendant disclosed '[PII] concerning any customer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by section 2710(b)(2)."[5] *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015).

i. Plaintiffs Allege Sufficiently that Defendants Are a Video Tape Service Provider.

A "video tape service provider" is "any person, engaged in the business. . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

Defendants argue that because the number of videos on their website is "dwarfed" by the number of other assets, this Court should find that they are not "engaged in the business . . . of rental, sale, or delivery" of videos and therefore they are not a "video tape service provider" under the statute. Mot. at 11; Reply at 4–5. Plaintiffs assert that they have alleged that delivery and sale of videos is a focus of Defendants' work. Opp'n at 7–9.

Looking within the four corners of the FAC and the judicially noticed Exhibits, the Court finds Plaintiffs' allegations about Defendants being a video tape service provider sufficient. Plaintiffs allege that Defendants' website "features over one hundred thousand prerecorded videos," FAC ¶¶ 2, 20, and that they generate revenue by "offering paid subscriptions to this video library," *id.* ¶ 3. Plaintiffs also allege that they signed up for Defendants' services "in exchange for access to [Defendants'] library of prerecorded videos." *Id.* ¶¶ 8, 9. Moreover, Exhibit A contains a quote from

[5] Defendants do not make any argument on the third element, i.e., whether the disclosure of Plaintiffs' PII was made knowingly. As such, the Court will not analyze whether Plaintiffs' allegations satisfy the requirement that the disclosure was made knowingly.

an individual, who appears to be an "author" of video templates available on Defendants' website, saying, "I've seen people use by templates for *commercials*, corporate *videos*, *video* greetings for customers . . . pretty much anything you can think of." ECF No. 23-2 at 3 (emphases added); *see* ECF No. 23-3 (Exhibit B, repeatedly referring to "videos"); ECF No. 23-4 (Exhibit B, listing the number of each type of audio-visual asset at 6,491,216 stock videos, 119,112 video templates, 193,116 music, and 743,497 sound effects); ECF No. 23-5 (Exhibit C, presenting "Royalty-Free Stock Videos"); ECF No. 23-6 (Exhibit D, presenting "Editable Video Templates"). Further, in terms of the number of assets for each category of creative assets in Defendants' website, the Courts notes that stock videos, counted at about 6.5 million assets, is second only to photos, which is around eleven million assets. *See generally* ECF No. 23-4 (Exhibit C). The Court also notes that stock videos appear first under the header "Browse by category" on Defendants' website, whereas photos do not appear until much farther down (or to the side). *Id*. Assuming the truth of Plaintiffs' allegations and drawing all reasonable inferences in their favor, the Court finds that Defendants are "engaged in the business of" the sale or delivery of video content and qualify as a video tape service provider. The statute does not require that the sale or delivery of video content be the primary focus of the business, and the Court will not add this requirement.

But even if it was required that Defendants be "substantially involved in the conveyance of video content to consumers [and] also significantly tailored to serve that purpose,"[6] as some district courts have interpreted the statute, *see In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017), Plaintiffs' allegations are sufficient to establish this.

Defendants assert that delivering video content is not "necessary to the Envato experience" because "designers could pay for creative assets on Envato without ever downloading a single

---

[6] Defendants further support their argument by citing *Carroll v. Gen. Mills, Inc.*, No. 23-cv-1746-DSF-MRWx, 2023 WL 4361093 (C.D. Cal. June 26, 2023) and *Cantu v. Tapestry, Inc.*, No. 22-cv-1974-BAS-DDL, 2023 WL 4440662 (S.D. Cal. July 10, 2023). The defendants in these cases, however, are distinguishable from Defendants here. In *Carroll*, the defendant General Mills manufactured food products, such as cereals and yogurt, 2023 WL 4361093, at *3, and in *Tapestry, Inc.*, the defendant did business as the luxury handbag brand Coach, 2023 WL 4440662, at *1. But here, Defendants sells "creative assets," which include millions of videos. ECF Nos. 23-3 (Exhibit B), 23-4 (Exhibit C). This difference, as well as Plaintiffs' allegations, permit the reasonable inference that sale of videos constitutes at least "a focus" of Defendants' business. *See Cantu v. Tapestry, Inc.*, 697 F. Supp. 3d 989, 993 (S.D. Cal. 2023).

video." Mot. at 11. This argument is unavailing. Neither the FAC nor the judicially noticed Exhibits show which of Defendants' assets make up the majority of their sales or revenue, and it is improper for the Court to make such a finding at this stage of the action.

For the foregoing reasons, the Court finds that Plaintiffs allege sufficiently that Defendants are a video tape service provider under section 2710(a)(4).

ii. Plaintiffs Allege Sufficiently that Defendants Disclosed Personally Identifiable Information.

The VPPA defines "personally identifiable information" to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The Ninth Circuit held that "'personally identifiable information' means only that information that would 'readily permit an ordinary person to identify a specific individual's video-watching behavior.'" *Eichenberger*, 876 F.3d at 985. Some courts have found in the context of trackers like the Meta Pixel, the transmitted information needs to be unencrypted. *Sellers v. Bleacher Rep., Inc.*, No. 23-cv-00368-SI, 2023 WL 4850180, at *4 (N.D. Cal. July 28, 2023).

Accordingly, for their complaint to survive, Plaintiffs must allege (1) that Defendants transmitted such data that permits an ordinary person to identity a specific individual and (2) that data permits the ordinary person to ascertain the specific individual's video-watching behavior.

As to the first issue, Plaintiffs allege sufficiently that Defendants disclosed their unencrypted Facebook IDs. FAC ¶ 37 ("The cookies that were transmitted as a result of the Meta Pixels that Defendant installed on its website conveyed Plaintiffs' and Class Members' Facebook IDs (*through the c_user cookie*).") (emphasis added); *see id.* ¶ 43 ("The c-user [*sic*] cookie contains that visitor's *unencrypted* Facebook ID.") (emphasis added).

Defendants assert that because "Plaintiffs do not allege that *their* names are included in their Facebook profiles," their allegation is insufficient. Reply at 3; Mot. at 13–14 (same). But the applicable legal standard is whether the disclosed information "*would readily permit* an ordinary person to identify" Plaintiffs, *see Eichenberger*, 876 F.3d at 985 (emphasis added) (cleaned up), not whether Plaintiffs' names *will* be identified. Even if the standard as interpreted by Defendants were

to apply, the Court finds that it is reasonable to infer from the allegations that an ordinary person will identify Plaintiffs' names with the allegedly disclosed unencrypted information.[7] *See* FAC ¶ 28 (explaining that Facebook requires users to share "the name they go by in everyday life"), 44 (explaining that appending a person's unencrypted Facebook ID to Facebook's URL leads to that person's Facebook webpage).

As to the second issue, Plaintiffs allege sufficiently that an ordinary person could identify their video-watching behavior. *Id.* ¶¶ 55, 61 (alleging that Defendants disclose data that contain "the titles of prerecorded videos" that Plaintiffs watch or download).

Accordingly, the Court finds that Plaintiffs alleged sufficiently that Defendants disclosed their PII as defined by the VPPA.

iii. <u>Consent is a Factual Issue Not Appropriate to be Decided on a Motion to Dismiss.</u>

The VPPA allows a video tape service provider to disclose PII of a consumer with the consumer's "informed, written consent." 18 U.S.C. § 2710(b)(2)(B). For consent to be valid, (1) the written consent must be "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer"; (2) "at the election of the consumer," the consent must be either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner"; and (3) the video tape service provider must provide "an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(b)(2)(B)(i)-(iii).

---

[7] This Court therefore declines to adopt the approach of the Second Circuit in *Solomon*. *See* 136 F.4th 41. The Second Circuit found that an ordinary person would not be able to distinguish a video title in a line of code or identify a Facebook ID in a line of code. *Id.* at 54. The ordinary person that the Second Circuit envisions appears to be one who is particularly unsophisticated or unmotivated to understand the information presented. This Circuit in *Eichenberger v. ESPN, Inc.*, however, has made clear that "modern technology may indeed alter—or may already have altered—what qualifies under the statute. A Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual." 876 F.3d 979, 986 (9th Cir. 2017). And given the allegations in the FAC, this Court finds that here, the unencrypted Facebook IDs would.

The Defendants are unable to establish, at this stage, that consent was given. For instance, the policies they state do not explicitly state that users' personally identifiable information will be disclosed to third parties. They merely state that Defendants collect information on user activity, that *no* personally identifiable information is collected by cookies, and that Defendants will use third party advertisers to serve ads. This is an insufficient basis for this Court to find that Plaintiffs allegations regarding their lack of consent are implausible and require dismissal. Accordingly, the Court finds that Plaintiffs have sufficiently pleaded their claim under the VPPA.

### C. Defendants Have Not Met Their Burden Under the Forum Non Conveniens Doctrine.

"[T]he doctrine of forum non conveniens is 'an exceptional tool to be employed sparingly,'" and for which the defendant bears the burden—at times described as a heavy burden—of proving the existence of an adequate alternative forum. *Gutierrez v. Advanced Med. Optics, Inc.*, 640 F.3d 1025, 1029 (9th Cir. 2011). In deciding whether to dismiss an action on forum non conveniens grounds, a court must examine (1) whether an adequate alternative forum exists and (2) the balance of private and public interest factors favors dismissal. *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142 (9th Cir. 2001). "[W]here the plaintiff is a United States citizen, the defendant must satisfy a heavy burden of proof." *Id*. at 1443 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981).

#### i. Defendants Have Not Shown the Availability of an Adequate Forum.

"[A]n adequate alternative forum ordinarily exists when the defendant is amendable to service of process in the foreign forum." *Id*. At the same time, "[t]he foreign forum must provide the plaintiff with some remedy for his wrong." *Id*.

Defendants have only partially satisfied the threshold requirements. The first requirement is met here. Mot. at 17 ("Defendants are amendable to service of process in Australia, where Defendants reside."). The Court, however, does not find that Defendants have satisfied the second requirement. In support of its argument that Australia's privacy laws offer remedies for Plaintiffs, they cite nonbinding cases. *See* Mot. at 18; Reply at 8–9. Moreover, the issues raised in those cases

are not applicable to the instant case.[8] The Court, based on these cases, cannot ascertain whether Australia's laws provide "some remedy" for the harm Plaintiffs allege.

Because Defendants has not shown that Australia offers remedies, however remotely, as those available under the VPPA, the Court finds that Australia is not an adequate, available forum for Plaintiffs' claims.

ii. The Balance of Private and Public Factors Weighs Toward Retaining the Action.

Courts consider the following private interest factors when determining whether to grant dismissal under forum non conveniens:

> (1) the residence of the parties and the witnesses;
> (2) the forum's convenience to the litigants;
> (3) access to physical evidence and other sources of proof;
> (4) whether unwilling witnesses can be compelled to testify;
> (5) the cost of bringing witnesses to trial;
> (6) the enforceability of the judgment; and
> (7) all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Lueck*, 236 F.3d at 1145 (internal quotation marks omitted).

The Court does not find any private interest factor weighing in Defendants' favor. On the one hand, Plaintiffs are residents of Florida and California.[9] FAC ¶¶ 8, 9. Relatedly, to the extent that Plaintiffs seek to represent a putative class of similarly situated "persons in the United States," FAC ¶ 73, it is reasonable to infer that their witnesses live in the United States. On the other hand, Defendants are "located in Australia, where many of its employees—likely witnesses in this case—also reside." *Id*. at 18. As such, the first private interest factor is neutral.

As to the second private interest factor, the Court finds that it weighs toward retaining the action. Plaintiffs' choice of forum is entitled to deference. *Carijano v. Occidental Petroleum Corp.*,

---

[8] *See Tansey v. Cochlear Ltd.*, No. 13-cv-4628 SJF SIL, 2014 WL 4676588 (E.D.N.Y. Sept. 18, 2014) (referencing the Privacy Act of 1988 within the context of production of documents); *Glob. Med. Sols., Ltd v. Simon*, No. 12-cv-04686-MMM (FMOx), 2013 WL 12371339 (C.D. Cal. Jan. 10, 2013) (involving claims unrelated to disclosure of private information); *McGechie v. Atomos Ltd*., No. 2:22-cv-01812-DJC-DB, 2024 WL 1054924 (E.D. Cal. Mar. 11, 2024) (same); *Silvertip Partners, LLC v. Proactive Preparedness, Inc.*, No. LACV 16-5826-VAP (ASx), 2018 WL 5099747 (C.D. Cal., 2018) (same).

[9] Although Defendants point to Plotsker's residence in Florida, Mot. at 18–19, the Court defers to his decision to file suit in Los Angeles.

643 F.3d 1216, 1227 (9th Cir. 2011) ("When a domestic plaintiff initiates litigation in its home forum, it is presumptively convenient.") (citing *Piper Aircraft Co.*, 454 U.S. at 255–56). Moreover, Defendants' Privacy Policy indicates that their lawyers are located, among other countries, the United States. ECF No. 23-11 at 4. Insofar as Defendants have relied on professionals in the United States, litigating this action in California appears to be more convenient than litigating in Australia.

Defendants argue that because Plaintiffs agreed to the forum selection provision in Defendants' User Terms, "the weight of any inconvenience to them" is lessened. Mot. at 19. As the Court held in Section II.B.iii., *supra*, however, whether Plaintiffs agreed to Defendants' Privacy Policy, Cookie Policy, or Terms of Use is a factual issue not appropriate at the current stage of litigation. As such, the Court does not consider at this time whether the forum selection provision tips the scale one way or another.

As to the parties' access to physical evidence and other sources of proof, the Court finds that this factor is neutral. Mot. at 19 ("Because . . . the evidence is likely to be exclusively electronic, [the third] private interest factor[] [is] neutral.")

As to whether unwilling witnesses can be compelled to testify, the Court finds this factor weighing toward retaining the action. Defendants contend that "[b]ecause the likely witnesses in this action are Envato employees who are under Envato's control," the fourth private interest factor is "neutral." *Id*. In contrast, Plaintiffs argue that this factor weighs toward them because they "would seek to compel testimony from Meta," who they believe will be an unwilling witness. Opp'n at 19–20 (citing Rule 45(b)(2), a court's subpoena power). Because this Court has the subpoena power to compel a domestic unwilling witnesses to testify—and more conveniently so—the fourth private interest factor weighs in Plaintiffs' favor.

As to the remaining three private interest factors—the cost of bringing witnesses to trial; the enforceability of the judgment; and all other practical problems that make trial of a case easy, expeditious, and inexpensive—Defendants state only that they are "neutral" but does not provide any supporting facts. *Id*.; *see generally* Reply (lacking any further supporting arguments or facts). In contrast, Plaintiffs rely on Federal Rule of Civil Procedure 43 to argue that the availability of remote testimony tips the scale toward Plaintiffs as to the fifth factor. Absent any further facts to consider,

the Court finds that the fifth private interest factor weighs toward retaining the action and the sixth and seventh factors neutral.

Courts also examine the following five public interest factors when determining whether to dismiss under forum non conveniens:

(1) local interest of lawsuit;
(2) the court's familiarity with governing law;
(3) burden on local courts and juries;
(4) congestion in the court; and
(5) the costs of resolving a dispute unrelated to this forum.

*Lueck*, 236 F.3d at 1147.

As to the first and second public interest factors, the Court finds that there is a strong local interest in this action and that it is familiar with the governing law. United States Congress enacted the VPPA, FAC ¶ 16, and the parties rely extensively on case law from California. *See generally* Mot.; Opp'n. Although Defendants argue that "Plaintiffs could assert their purported privacy interests by invoking Australia's privacy laws," Plaintiffs can do so equally in California—and have done so by filing suit here. *See generally* FAC.

As to the third and fourth public interest factors, although this District's docket is congested, this Court does not use forum non conveniens as a means to lessen its load. *See Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1337 (9th Cir. 1984) ("The forum non conveniens doctrine should not be used as a solution to court congestion; other remedies, such as placing reasonable limitations on the amount of time each side may have to present evidence, are more appropriate.").

As to the fifth public interest factors, the parties do not engage with it in any meaningful way. Thus, the Court finds this factor neutral.

In sum, the Court does not find that Australia is a more proper forum for this Action. As such, the Court DENIES the Motion to the extent that it is based on the forum non conveniens doctrine.

/ / /

/ / /

**CONCLUSION**

For the foregoing reasons, the Court hereby ORDERS as follows:

1. Defendants' Request for Judicial Notice is GRANTED; and
2. Defendants' Motion to Dismiss is DENIED.

IT IS SO ORDERED.

Dated: August 26, 2025

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge